UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

NOEL O. CARTER

     Plaintiff,

vs.

JOHN "BUDDY" DYER, in his official
capacity as Mayor of The City of Orlando,
Florida; JOHN MINA, in his individual capacity;
OFFICER DAVID CRUZ, individually; and
OFFICER CHARLES MAYS, individually.

     Defendants.

_____/

Case No: 6:19-cv-1030

**DEMAND FOR JURY TRIAL**

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**
**INTRODUCTION, JURISDICTION, AND VENUE**

COMES NOW, Plaintiff NOEL O. CARTER ("MR. CARTER"), through undersigned

counsel, sues jointly and severally JOHN "BUDDY" DYER in his official capacity as Mayor of

The City of Orlando, Florida ("MAYOR DYER"); JOHN MINA in his individual capacity as

Police Chief of The City of Orlando, Florida ("CHIEF MINA") of the Orlando, Florida; Officer

DAVID CRUZ, individually ("OFFICER CRUZ"); and Officer CHARLES MAYS, individually

("OFFICER MAYS"): collectively, ("DEFENDANTS") and allege as follows:

1. This is a civil rights action arising from egregious acts of police misconduct committed by

    OFFICER CRUZ; OFFICER MAYS and the Orlando Police Department ("OPD").

2. Plaintiff, MR. CARTER, a 30-year old African-American male, who was at the time of the

    constitutional violations against him a resident of Hollywood, Broward County, Florida.  He

    was also a college graduate, who was working in financial management for a large U.S. based

bank. He now seeks relief for DEFENDANTS' violation of his rights secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983 and 1988; and the Fourth Amendment of the United States Constitution.

3. Plaintiff MR. CARTER seeks compensation for the unconstitutional and tortious conduct of Defendants OFFICER CRUZ and OFFICER MAYS who wrongfully used excessive force against him.

4. This action makes issue and alleges violations of the United States Constitution including, but not limited to a violation of the Fourth Amendment, which makes illegal the unnecessary and unreasonable use of force against persons during their arrest.

5. This Honorable Court has original jurisdiction over this action and the parties named herein pursuant to the provisions of 42 U.S.C. Sections 1983 and 1988; the United States Constitution; the provisions in 28 U.S.C. Sections 1331 and 1343, et.seq.

6. Venue is proper in this district under 28 U.S.C. Section 1391(b) in that all acts, omissions and practices described hereafter, giving rise to these claims all occurred in Orange County, Florida, and within the jurisdiction of the United States District Court in and for the Middle District of Florida.

7. Plaintiff's claim for relief is predicated upon 42 U.S.C. Section 1983 and upon 42 U.S.C. Section 1988, which authorizes the award of attorney's fees and costs to a prevailing party in actions brought pursuant to 42 U.S.C. Section 1983.

8. At all times material hereto, the acts, omissions, practices and other conduct of each defendant were committed under color of state or local law.

9. At all times material hereto, the acts, omissions, practices and other conduct of Defendants

OFFICER CRUZ and OFFICER MAYS were committed, within the course and scope of his employment with the City of Orlando and under the supervision and direction of Defendant, JOHN MINA, the Chief of Police for the City of Orlando, Florida.

## PARTIES

10. At all times material hereto, Plaintiff MR. CARTER was and is a citizen of the United States, and at all times material hereto was and is a resident of City of Hollywood, Broward County, Florida. Plaintiff has retained the services of undersigned counsel and is obligated to pay a reasonable attorney's fee for such services in pursuing the claims asserted herein.

11. At all times material hereto, Defendant MAYOR DYER was and is a "person" subject to suit under 42 U.S.C. Section 1983. Defendant MAYOR DYER was mayor for The City of Orlando, Florida, and was at all times material hereto, acting in his official capacity and under the color of state law. He was responsible for, *inter alia,* the policies, procedures, and customs of the OPD as the final policymaker; including policies, practices procedures, and/or customs of the OPD concerning the OPD's Use of Force and Apprehension techniques that violated MR. CARTER'S constitutional rights as set forth in this complaint. He was also responsible for training and supervising his officers. Defendant MAYOR DYER, through his officers, employees and agents, was responsible for the proper and efficient enforcement of the laws, regulations, policies, practices, and procedures of such political entity; the laws and regulations of the State of Florida; and the Constitution of the United States. At all times hereto, his agents, employees, and/or servants were acting within the course and scope of their agency, apparent agency, and employment and under color of law. MAYOR DYER is being sued in his official capacity.

12. At all times material hereto, Defendant, CHIEF MINA was and is a "person" subject to suit under 42 U.S.C. Section 1983. Defendant, CHIEF MINA was the Chief of Police for the City of Orlando, Florida and was at all times material hereto, acting in his official capacity and under the color of state law. He was responsible for, inter alia, the policies, procedures and customs of the OPD, in particular, he was personally involved in the implementation of significant changes in how officers can use force when involved in an arrest which resulted in the constitutional depravation of NOEL CARTER'S right. He was responsible for the training and supervising his officers. Defendant, CHIEF MINA, through his officers, employees and agents, was responsible for the proper and efficient enforcement of the laws, regulations, policies, practices and procedure of such political entity; the laws and regulations of the State of Florida, and the Constitution of the United States. At all times, his agents, employees and/or servants were acting within the course and scope of the OPD with their agency, apparent agency and employment and under the color of law. CHIEF MINA is being sued in his individual capacity.

13. At all times material hereto, Defendant, OFFICER CRUZ was a police officer with the City of Orlando, under the supervision of Defendant, MAYOR DYER and Defendant, CHIEF MINA, acting within the course and scope of his employment and under the color statutes, law and Constitution of the United States. At all times relevant to this matter, OFFICER CRUZ was personally involved in the unreasonable use of force used against NOEL CARTER. He is being sued in his individual capacity.

14. At all times material hereto, Defendant OFFICER MAYS was a police officer with the City

- 4 -

of Orlando, under the supervision of Defendant MAYOR DYER and Defendant CHIEF MINA, acting within the course and scope of his employment and under color of the statutes, law and the Constitution of the United States. At all times relevant to this matter, OFFICER CRUZ was personally involved in the unreasonable use of force used against NOEL CARTER. He is being sued in his individual capacity.

## **FACTUAL ALLEGATION COMMON TO ALL COUNTS**

15. On or about June 2, 2015, MR. CARTER, was contacted by Joanne Espejo, a woman whom MR. CARTER was involved with romantically. It was agreed that MR. CARTER would travel from his home in South Florida to the Orlando area, on Thursday, June 4, 2016, to stay with Ms. Espejo for the weekend and then drive her back to South Florida were Ms. Espejo's family resides.

16. MR. CARTER also agreed that on the evening of Thursday, June 4, 2015, he would take Ms. Espejo to a concert at a night club called Venue 578, which is located on Orange Avenue in downtown Orlando, Florida.

17. On Thursday, June 4, 2015, MR. CARTER arrived at Ms. Espejo's apartment which was in a gated apartment complex. MR. CARTER parked his car within the gate and brought his things into Ms. Espejo's apartment with the agreement that he would be spending the weekend with her.

18. Prior to going to the nightclub, Ms. Espejo invited and a male friend of hers to join her and MR. CARTER for dinner. During dinner, Ms. Espejo began drinking excessively and flirting with her male friend. Although MR. CARTER and the male friend both began to feel uncomfortable with the situation, the group enjoyed dinner and walked to the club, together.

19. The group arrived before the show started. As the show started, Ms. Espejo continued to drink and began acting different towards MR. CARTER. MR. CARTER assumed it was the alcohol and that she was becoming intoxicated.

20. MR. CARTER attempted to speak with her in the club, but it was too loud. He then requested that she walk outside the club so they could talk.

21. They exited the Venue 578 and waked north on Orange Ave. They stopped on the northside of Concord Street and Orange Avenue. MR. CARTER was simply trying to find out why it was Ms. Espejo acting so different towards him. He did not raise his voice nor was he acting aggressively. He was simply trying to figure out why she invited him up for the weekend when she was acting like she didn't want him with there.

22. As they were talking, Ms. Espejo became very loud and animated. She was yelling and dramatically flailing her arms as she spoke. It was upon observing this interaction between, MR. CARTER and Ms. Espejo that OFFICER CRUZ appeared and got involved.

23. MR. CARTER initially explained to OFFICER CRUZ that they were just having a discussion. However, OFFICER CRUZ stated that he wanted MR. CARTER and Ms. Espejo to come over to the north sided of Venue 578. OFFICER CRUZ in the process of walking over to Venue 578 had radioed for OFFICER MAYS (who was working in the parking lot behind Venue 578) to come assist.

24. OFFICER CRUZ then took Ms. Espejo and began talking to her. While OFFICER CRUZ was talking her, MR. CARTER could see her crying and getting upset. Meanwhile, OFFICER MAYS had come and stood next to MR. CARTER.  At no time did OFFICER CRUZ nor OFFICER MAYS ever ask MR. CARTER his name. While OFFICER MAYS stood next to

MR. CARTER, he never spoke to MR. CARTER at all to get his name nor to ascertain what was going on in the situation.

25. After OFFICER CRUZ finished speaking to Ms. Espejo he walked over to MR. CARTER and stated, "she doesn't need a ride home she has a ride and MR. CARTER can leave".  MR. CARTER tried to explain to OFFICER CRUZ that he didn't drive her to the club and that he had no way to get back to her apartment or to get his belonging out of her apartment, including his car key and car, since she lived in a gated community.

26. MR. CARTER was not loud, belligerent or aggressive he merely wanted to explain this situation to OFFICER'S CRUZ and MAYS. As MR. CARTER was trying to explain about his belongings being at Ms. Espejo's apartment, suddenly and without warning, OFFICER CRUZ pushed MR. CARTER. MR. CARTER had both his arms in a non-threatening position. However, OFFICER CRUZ then grabbed MR. CARTER's arms and while OFFICER MAYS sprayed Saber Red pepper spray directly into MR. CARTER's eyes. OFFICER CRUZ then tackled MR. CARTER while MR. CARTER was frantically trying to get the painful spray out of his eyes. MR. CARTER never used any force; he was still trying to see due to the spray in his face. OFFICER CRUZ then pulled his taser and contact tasered over 10,000 volts in MR. CARTER in the back-right shoulder area. MR. CARTER didn't know what had hit him and he reflexively swung his arm back causing OFFICER CRUZ to drop the taser.

27. Over the next 30 seconds to a minute, OFFICER CRUZ and OFFICER MAYS unreasonably used multiple uses of force tactics including taser; Saber Red Spray; fists and metal batons in striking MR. CARTER. MR. CARTER fell to the ground at the front of the club and was on his knees in a praying position. OFFICER CRUZ and OFFICER MAYS continued to strike

MR. CARTER with their metal batons. MR. CARTER believing that they may kill him, got up and began running northbound on the sidewalk of Orange Avenue.

28. After running approximately 75-100 yards, MR. CARTER realized he needed to stop as he feared he may be shot in the back. Thus, he walked across Orange Avenue and sat on the curb on the eastside of Orange Avenue in front of the Orlando Sentinel newspaper building. He sat in non-confrontational position. OFFICER CRUZ and OFFICER MAYS gave chase and came upon him sitting on the curb. MR. CARTER indicated that he was giving up. Neither OFFICER CRUZ nor OFFICER MAYS gave any verbal instruction to MR. CARTER. OFFICER CRUZ came on MR. CARTER'S left side and OFFICER MAYS on his right side. Then without any provocation, OFFICER CRUZ and OFFICER MAYS began to savagely kick and beat MR. CARTER.

29. First, it was OFFICE CRUZ who came up and kicked MR. CARTER in his upper left arm area causing MR. CARTER to almost fall to the ground while he sat on the curb. Then both OFFICER CRUZ and OFFICER MAYS unreasonably beat MR. CARTER with their firsts, kicking him, punching him and hitting him with their batons. OFFICER MAYS then, for no reason, shot MR. CARTER with his taser. As MR. CARTER lay on the ground after being tasered, OFFICER CRUZ then proceeds to kick MR. CARTER in the abdomen area. As MR. CARTER sits up, he slouches having been tasered with 10,000 volts, OFFICER CRUZ, for no reason, began to kick MR. CARTER 7 times in the right side. While, OFFICER CRUZ is kicking a helpless and begging man, OFFICER MAYS reloads his taser and strikes MR. CARTER in chest. Whereupon, MR. CARTER falls back limp onto the pavement a battered and beaten man. All of these events were captured on cell phone video by a concerned by-

stander.

30. At the time of the encounter in front of the Orlando Sentinel Building, OFFICER CRUZ and OFFICER MAYS acted unreasonable and used excessive force on a passive and non-aggressive MR. CARTER. These Officers used excessive and unlawful force on MR. CARTER when MR. CARTER poised no threat to them. In fact, MR. CARTER even sat on the curb and had given up his attempt to run away from their initial beating.

31. Ultimately, MR. CARTER was arrested and jailed for the following felonies: 1) Battery on Law Enforcement Officer; 2) Battery (Dating Violence); 3) Resisting Arrest without violence; 4) Resisting Arrest without Violence (a Misdemeanor)

32. On June 5, 2015, MR. CARTER had Bail set and Bonded out and was released.

33. However, on June 5, 2015, the cell phone video, recorded by the concerned by-stander, was released on television and showed the beating of MR. CARTER by OFFICER CRUZ and OFFICER MAYS.  It was eventually learned that the cell phone video was taken by Katrina Compton, who lived in an apartment overlooking Orange Avenue. Ms. Compton stated that she heard yelling in the street and when she looked out, she saw 2 officers beating a man. She then grabbed her cell phone and captured the last part of the beating, specifically the 7 kicks from OFFICER CRUZ and the last chest taser by OFFICER MAYS. Ms. Compton was so appalled by the beating; she took the video to the Orlando Sentinel and it was eventually broadcasted all over the country.

34. Prior to the video being shown on television, OFFICER CRUZ and OFFICER MAYS had completed OPD field reports outlining each Officers version of what had happened.  However, these field reports were full of inaccuracies and falsehoods.  The publishing of the initial

"Balcony Video" was appalling and made people who saw it angry. In response, new agencies began seeking other videos or information concerning this arrest. Further, MR. CARTER was devasted to see the beating he took. However, MR. CARTER indicated this video only showed a small portion of the full beating he was given by OFFICER CRUZ and OFFICER MAYS.

35. On June 5, 2016, OPD began aggressively canvasing the area around the site of beating to see if there was any other video evidence showing the attack. This initial investigation was supervised by OPD Sgt. Andrew Gillespie. Sgt. Gillespie was the on-duty Sgt when the arrest of MR. CARTER took place. He also signed off on OFFICER CRUZ and OFFICER MAYS Field inaccurate reports.

36. Upon information and belief, Sgt Gillespie contacted OFFICER'S CRUZ and MAYS to have them come to the Police station to go over what happened; to review the video and to help canvas the area. Sgt. Gillespie learned that the Orlando Sentinel's building security camera had captured most of the events of that night.  Sgt. Gillespie was shown the video footage taken from a security camera which faced Orange Avenue. Upon reviewing the video, even though this video showed the unlawful use of force, Sgt. Gillespie informed the security officers at the Orlando Sentinel that the video was not helpful in the investigation. Essentially, Sgt. Gillespie had extremely hurtful video footage for the OPD and OFFICER CRUZ and OFFICER MAYS, yet he ignored it, as was the policy of OPD in excessive force cases.

37. Thankfully, approximately on or about June 9, 2016, a reporter for the Orlando Sentinel also reviewed the security video and saw that it showed the entire beating that OFFICER'S CRUZ and OFFICER MAYS gave to MR. CARTER after he had surrendered to them and sat on the curb.  This video was quickly put on the airwaves and the public anger against these Officer

became very loud.

38. Upon seeing both videos. MR. CARTER requested that OFFICER CRUZ and OFFICER MAYS be terminated and charged criminally for the unprovoked beating they gave him.

39. OPD placed the Officers on administrative leave and indicated that the case would be assigned to FDLE (The Florida Department of Law Enforcement) to do an "independent investigation" in the allegations against OFFICER CRUZ and OFFICER MAYS. The truth is the investigation by FDLE was far from being independent. This so-called investigation concluded with a summary report that was replete with inaccurate and misleading conclusions. In fact, The FDLE investigation had nothing to do with investigating the actions of OFFICER'S CRUZ and MAYS. It had everything to do with building a case against MR. CARTER to save face in the public.

40. The Investigator assigned to handle the case for FDLE was Special Agent Stephen A. Brenton ("Agent Brenton").  On or about June 11, 2015, Agent Brenton was requested to conduct an investigation into the use of force by OPD OFFICERS CRUZ and MAYS on MR. CARTER.

41. Agent Brenton took audio statements of the following witnesses: Noel Carter, William Weaver, Sgt Andrew Gillespie,  Joanne Espejo, Trevanti Whitfield, Andrew Taylor, Katrina Compton, Club Venue 578 employees (Jeannie McKnight, Paul Thomas, Vaughn Daley and Ana Maria Molina); Edward Elma, Wengy Elma, and Orlando Fire Department Personnel (Travis Reynolds; Jacob O'Connell and Todd Tinetti).  As a result of these audio statements Agent Brenton attempted to summarize the audio interviews into his investigative summary. He inaccurately concluded many critical issues in his written "Investigative Summary".

42. Agent Brenton summarize multiple inaccuracies especially concerning the employees of Club

Venue 578.  As discussed previously, Agent Brenton's investigation had little to do with investigating the use of force by OFFICER'S CRUZ and MAYS and everything to do with building a case against MR. CARTER. Agent Brenton's report falsely stated or wrongly implied that MR. CARTER was an intoxicated, hot-head who was doing many improper actions in the club and had to be removed by Club security.

43. As examples, Agent Brenton wrote in his summary of club employee, Jeannie McKnight's audio interview, that MR. CARTER went into the dishwashing area and was escorted out the club. MR. CARTER never went into the dishwashing area and nor was he was ever escorted out of the club by security. In the summary of Ana Maria Molina, Agent Brenton concluded that MR. CARTER was in a restricted area and then as Ms. Molina was working, MR. CARTER tried to raise the door at the end of the bar and get behind the bar. Agent Brenton also wrote that it was due to this action by MR. CARTER, that was escorted out of the bar by security. On the audio of Ms. Molina's statement, she indicated it was a white male who tried to get behind the bar; not MR. CARTER.

44. In all 3 summaries of persons who interacted with MR. CARTER in the bar, Agent Brenton wrongly concludes in his report that MR. CARTER was escorted out the bar. MR. CARTER was never escorted out of the bar by security. This conclusion is clearly evident in the Club's security video which shows MR. CARTER and Ms. Espejo leaving the club together out the VIP exit while passing Club Security and OFFICER CRUZ's patrol car.

45. The significance of Agent Brenton's conclusion in the "Investigative Summary" is this summary was completely relied upon by the State Attorney's Office in determining not to pursue charges against OFFICERS CRUZ and/or MAYS.

46. Most troubling was Agent Brenton's interview with Joanne Espejo. Ms. Espejo was the main witness concerning charge against MR. CARTER for Battery (Dating Violence). Agent Brenton never put in his summary that when he asked Ms. Espejo if she thinks MR. CARTER did anything wrong she said "NO". She didn't want to do anything against him and did not feel that MR. CARTER would hurt or tried to harm her on the night in question.

47. To make matter even worse, after Ms. Espejo indicated she didn't want to do anything against MR. CARTER. A follow up question that had nothing to do with the investigation into the use of force by OFFICERS CRUZ and/or MAYS was asked, it was "At any point during Noel's visit the night this happened from when he arrive until you didn't see him again did you ever give him permission to put his hands on you, or to touch you, push you, strike you, in any manner?" Espejo replied, "Not at all". That question was asked in a vacuum and the logical follow-up question of "did Noel ever put his hands on you, or to touch you, push you, strike you, in any manner" was never asked. The questioning of Ms. Espejo is unequivocal proof that there was as breach of the independence of this investigation of OFFICER MAY AND OFFICER CRUZ and it had everything to do with building a pretextual criminal case against MR. CARTER.

48. Agent Brenton also had the opportunity to review multiple video tapes showing the incident at the Club, as well, video showing the attack on MR. CARTER on the curb in front of the Orlando Sentinel Building. Agent Brenton in his "Investigative Summary" report identifies on page 21 that he reviewed the video from the Orlando Sentinel Security labeled "Camera/Video #13 (Part 1). This is the only video which depicts the entire attack on MR. CARTER. Any evaluation of this video shows the attack on MR. CARTER. Agent Brenton provides no

summary of the numerous blows given to MR. CARTER by OFFICERS CRUZ and MAYS, including kicks; punches; taser; and baton blows. It also shows absolutely no aggressive actions by MR. CARTER. Agent Brenton summarizes his view of the video as "**The Video cannot be dissected to accurately describe exactly what was occurring because of the quality of the video and the distance of camera view**".

49. On August 26th, 2015 Special Agent Stephen A. Brenton presented his "Investigative Summary" to the State Attorney's Office for the Ninth Judicial Circuit in Orange County for its review. The State Attorney's Office relied conclusively on Agent Brenton's summary which was full of inaccuracies.

50. This was a coordinated effort by the State Attorney's Office; FDLE and the OPD to use the FDLE investigation to gather evidence to pursue charges against MR. CARTER and not OFFICERS CRUZ and MAYS. The disturbing conclusion was that on August 14, 2015, 12 days before Special Agent Stephen A. Brenton had conclude his investigation, the State Attorney's Office had filed charges against NOEL O. CARTER.

51. On or about October 8, 2015, Jeffrey L. Ashton, State Attorney for the Ninth Judicial Circuit for Orange County, Florida informed JOHN MINA, Chief of Police, Orlando Police Department that his office had concluded that there is no legal basis for any criminal charges against either OFFICER CRUZ nor OFFICER MAYS.

52. OFFICERS CRUZ and OFFICER MAYS used excessive force and brutality during their attempt to arrest MR. CARTER causing significant injuries MR. CARTER. MR. CARTER suffered fear, humiliation, invasion of privacy, anxiety, emotional and mental distress, and injury.

53. The underlying reason for the attack on MR. CARTER is policy incorporated by the OPD and the culture that has been created is that if you run from an OPD officer, regardless if you surrender and pose no threat at all, that you will be given a beating by the responding OPD officers. That is the reason why MR. CARTER was so viciously attacked. He ran!

54. At all times material MAYOR DYER, as mayor of The City of Orlando and CHIEF MINA are the final policymakers for OPD, a governmental entity.

55. On information and belief, Defendant MAYOR DYER and Defendant, CHIEF MINA knew or should have known of prior similar incidents of OPD officers using excessive force and brutality to when attempting to apprehend a suspect, in violation of the Constitution, federal, and / or state law.

56. On information and belief, Defendant MAYOR DYER and Defendant, CHIEF MINA maintained a policy or custom at OPD which fostered, condoned, and encouraged its officers to use excessive force, wrongfully arrest, or otherwise violate citizens' rights.

57. Prior to the attack on MR. CARTER, CHIEF MINA upon becoming Chief made significant changes to the OPD policy and procedures concerning the "USE OF FORCE AND APPRHENSION TECHNIQUES. CHIEF MINA significantly increased an Officers ability to respond to a situation with force.

58. The OPD's written use of force policy regarding the use of force is confusing, ambiguous, and permits the use of force in situations and under circumstance that are completely at odds with the Fourth Amendment standard of "objective reasonableness", as articulated by the United States Supreme Court. On information and belief and at all relevant times, OFFICER CRUZ and OFFICER MAYS acted in accordance with the policies and customs of OPD, as

established or ratified by the MAYOR DYER and CHIEF MINA, when they viciously and brutally beat MR. CARTER.

59. On information and belief Defendant MAYOR DYER and Defendant, CHIEF MINA, despite his knowledge of OPD officers' use of excessive force, brutality and indifference to human life which caused Plaintiff CARTER'S's injuries, Defendant MAYOR DYER and Defendant, CHIEF MINA acted with deliberate indifference to these prior constitutional deprivations by, among other things, turning a blind eye to them, and failing to discipline or otherwise correct the officers' behavior.

60. On information and belief, Defendant MAYOR DYER and Defendant, CHIEF MINA supported, justified, condoned, and otherwise ratified OFFICER CRUZ and OFFICER MAY's decision to use excessive force and otherwise violate MR. CARTER's rights.

61. In the aftermath of these events, MR. CARTER has undergone medical treatments for his injuries. MR. CARTER still experiences headaches, dizzyness, blurred vision and pain.

62. As a result of OFFICER CRUZ and OFFICER MAYS's meritless, unlawful, unreasonable, and abusive misconduct; MR. CARTER, has suffered economic and non-economic damages. These losses and harms to MR. CARTER include, but are not limited to:

    a. MR. CARTER being battered by Officer Cruz and Officer Mays;

    b. MR. CARTER suffering head trauma as a result of being battered by Officer Cruz and Officer Mays;

    c. MR. CARTER incurring medical treatment and medical bills;

    d. MR. CARTER having suffered economically as it has affected his employment;

    e. Emotional Trauma.

f.   Anxiety.

g.   Public Shame and Humiliation.

63. Plaintiff NOEL O. CARTER has retained The Law Office of Natalie Jackson to brings this case and to seek compensation on his behalf.

### COUNT I: CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983 (PLAINTIFF CARTER'S CLAIM FOR EXCESSIVE FORCE AGAINST OFFICER DAVID CRUZ AND OFFICER CHARLES MAYS IN THEIR INDIVIDUAL CAPACITY)

64. Plaintiff repeats and re-alleges each and every allegation set forth in above paragraphs numbered "1" through 52 and 61 through 62", inclusive with the same force and effect as if more fully set forth at length herein.

65. At all times material hereto, OFFICER CRUZ and OFFICER MAYS had a legal duty to use only that amount and degree of force in the apprehension of suspects as was reasonable under the circumstances, for proper and efficient arrest, supervision, and control of such persons.

66. MR. CARTER posed no threat to OFFICER CRUZ and/or OFFICER MAYS or others.

67. OFFICER CRUZ and OFFICER MAYS disregarded MR. CARTER's rights, life and well-being, when he wrongfully used excessive force against MR. CARTER.

68. OFFICER CRUZ and OFFICER MAYS struck MR. CARTER with their fists; feet; tasers and metal baton as he sat helpless on the curb of Orange Ave and beat him with such brutality and force as to cause serious bodily injury to MR. CARTER.

69.  MR. CARTER was unarmed and posed no threat to OFFICER CRUZ and/or OFFICE MAYS or any others.

70. OFFICER CRUZ and OFFICER MAYS used undue violence against MR. CARTER without legal right to use any force against him, as there were no lawful grounds to use such excessive

force under the circumstances.

71. OFFICER CRUZ and OFFICER MAYS caused severe bodily injuries to MR. CARTER by physically assaulting him and using inordinate and inappropriate force.

72. By his actions, OFFICER CRUZ and OFFICER MAYS deprived Plaintiff of the clearly established right to be free from force which was excessive under the circumstances, in violation of Plaintiff's rights under the Fourth Amendment to the U.S. Constitution.

73. As a direct, proximate, and foreseeable result of OFFICER CRUZ and OFFICER MAYS's actions, MR. CARTER suffered constitutional deprivations, bodily injuries, and resulting pain and suffering, mental anguish, loss of ability to enjoy life, loss of potential earning, public humiliation, and other injuries relating to this incident. These injuries and losses are permanent and continuing, and Plaintiff will suffer such losses in the future.

WHEREFORE, Plaintiff NOEL O. CARTER prays that this Honorable Court grant the following relief on his civil rights claim brought pursuant to 42 U.S.C. § 1983 and 1988:

     A. Judgment for compensatory damages against OFFICER CRUZ and OFFICER MAYS;

     B. Judgment for punitive damages against OFFICER CRUZ and OFFICER MAYS;

     C. Judgment for attorney's fees pursuant to 42 U.S.C. § 1988, together with the costs and expenses of this civil rights action;

     D. Judgment for pre-judgment interest on attorney's fees for delay in payment;

     E. A trial by jury on all issues so triable; and

     F. Such other and further relief that this Court may deem just, proper, and appropriate.

## COUNT II: CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983 (PLAINTIFF CARTER'S EXCESSIVE FORCE CLAIM AGAINST MAYOR DYER, IN HIS

**OFFICIAL CAPACITY AND JOHN MINA, IN HIS INDIVIDUAL CAPACITY AS CHIEF FO POLICE FOR THE CITY OF ORLANDO)**

74. Plaintiff repeats and re-alleges each and every allegation set forth above paragraphs numbered "1" through "62" inclusive with the same force and effect as if more fully set forth at length herein.

75. At all times material hereto, Defendant MAYOR DYER and Defendant, CHIEF MINA, as the final policymakers of the OPD, had a duty to adopt and implement rules and procedures to ensure that his officers used a reasonable amount and degree of force when apprehending suspects.

76. Defendant MAYOR DYER and Defendant, CHIEF MINA's failure to adopt and implement adequate policies regarding his officers' use of force resulted in the blatant use of excessive force by Defendant OFFICER CRUZ and OFFICER MAYS against Plaintiff.

77. At all times material hereto, Defendant MAYOR DYER and Defendant, CHIEF MINA knew, and it was foreseeable, that persons being arrested by his officers might be subjected to use of force.

78. At all times material hereto, Defendant MAYOR DYER and Defendant, CHIEF MINA knew, and it was foreseeable, that an adequate policy for the use of force was necessary in order to avoid repeated use of excessive force by his officers in similar circumstances.

79. At all times material hereto, Defendant MAYOR DYER and Defendant, CHIEF MINA were aware that the failure to establish a procedure, policy, and practice relating to the reasonable use of physical force and the disciplining of officers who use excessive force would result in serious injury to members of the general public, which ultimately led to the excessive force used against Plaintiff.

80. At all times material hereto, Defendant MAYOR DYER and Defendant CHIEF MINA were aware that the failure to establish a procedure, policy, and practice relating to the adequate training and supervision of officers executing traffic stops, would create a high risk of serious injury to members of the general public.

81. At all times material hereto, Defendant MAYOR DYER and Defendant, CHIEF MINA were deliberately indifferent to the known probability that officers could and likely would exhibit excessive force and abuse the public by the use of restraints or other uses of physical force, such as in the case of Plaintiff CARTER, by failing or refusing to establish a sufficient use of force policy to prevent such actions.

82. Defendant MAYOR DYER and Defendant, CHIEF MINA had a policy, practice, or custom of failing to adequately supervise and discipline officers, employees, and agents of the OPD for the unlawful use of force and detentions.

83. Defendant MAYOR DYER and Defendant, CHIEF MINA exhibited deliberate indifference by his failure, as official policymaker of the OPD, to train his employees to handle recurring situations that present an obvious potential for a constitutional violation. More specifically, Defendant MAYOR failed to train officers on appropriate use of force when effectuating an arrest. This failure resulted in the violation of Plaintiff's constitutional rights.

84. Defendant MAYOR DYER and Defendant, CHIEF MINA, failed to ensure that Defendant OFFICER CRUZ and OFFICER MAYS did not apply unreasonable detention and/or force in his use of restraint methods as it relates to innocent members of the public, and allowed officers to deploy unlawful measures on subjects where the use of such force was unnecessary and excessive.

85. At all times material hereto, Defendant MAYOR DYER and Defendant CHIEF MINA knew, and it was foreseeable, that a policy of adequately supervising and auditing the uses of force by officers, in general, and/or, when dealing with persons who have purposely surrendered to the Officer which was necessary in order to avoid repeated use of excessive force by OPD Officers. Without tracking historical data pertaining to historical uses of force, Defendant MAYOR would be unable to be advised of repetitive and recurring constitutional violations that required remedies and revisions to the policies and procedures in place, requiring additional training or supervision with regard to use of deadly force or excessive force.

86. At all times material hereto, Defendant MAYOR DYER and Defendant CHIEF MINA were aware that the failure to establish a policy of adequately supervising and auditing the uses of force by officers would result in repeated and recurring instances of constitutional violation and excessive force, resulting in serious injury to citizens in Orlando, Florida.

87. At all times material hereto, Defendant MAYOR DYER and Defendant, CHIEF MINA was deliberately indifferent to the known probability that instances of force by officers would occur, such as in the case of Plaintiff, by failing or refusing to establish a policy of adequately supervising and auditing use of force incidents by officers.

88. As a direct, proximate, and foreseeable result of Defendant MAYOR DYER and Defendant CHIEF MINA's policies, customs and practices, Plaintiff has suffered constitutional deprivations, bodily injuries and resulting pain and suffering, mental anguish, loss of ability to enjoy life, expenses of legal counsel, loss of earnings, and other injuries and losses. These injuries and losses are permanent and continuing, and Plaintiff will suffer such losses in the future.

89. Defendant MAYOR DYER and Defendant CHIEF MINA acted with deliberate indifference in causing the aforesaid constitutional violation by Defendant OFFICER CRUZ and OFFICER MAYS to occur, as follows:

   a) Defendant MAYOR DYER and Defendant CHIEF MINA failed to adequately monitor and evaluate the performance of his officers, including Defendant OFFICER CRUZ and OFFICER MAYS, regarding the use of force applications and exhibited a deliberate indifference and reckless disregard to citizens' rights, including Plaintiff;

   b) Defendant MAYOR DYER and Defendant CHIEF MINA failed to adequately supervise his officers, and possessed deliberate indifference and reckless disregard to persons who came into contact with them, including Plaintiff;

   c) Defendant MAYOR DYER and Defendant CHIEF MINA had and has a policy, custom, and practice of allowing his officers, including Defendant OFFICER CRUZ and OFFICER MAYS, to use excessive and/or unreasonable force without fear of discipline, thereby creating an atmosphere where such behavior is accepted, approved and ratified, in reckless disregard and deliberate indifference to the health and welfare of persons in his custody, including Plaintiff.

90. The aforementioned actions committed by Defendant OFFICER CRUZ and OFFICER MAYS were proximately caused by the de facto policies, customs, and practices of Defendant MAYOR DYER and Defendant CHIEF MINA, the failure to establish proper policies, customs, and practices, his failure to adequately supervise and monitor his officers, and his ratifications of officers' use of excessive force, as alleged in paragraphs 1 through 66.

91. The aforementioned policies, customs, practices, and omissions of Defendant MAYOR DYER

and Defendant CHIEF MINA, alleged in paragraphs 1 through 66, were the underlying cause of Plaintiff's injuries and damages.

WHEREFORE, Plaintiff NOEL O. CARTER prays that this Honorable Court grant the following relief on his civil rights claim brought pursuant to 42 U.S.C. § 1983 and 1988:

A. Judgment for compensatory damages against Defendant MAYOR DYER and Defendant CHIEF MINA;

B. Judgment for attorney's fees pursuant to 42 U.S.C. § 1988, together with the costs and expenses of this civil rights action;

C. Judgment for pre-judgment interest on all economic losses, including judgment for damage due to the lack of insurability of Plaintiff; and pre-judgment interest on attorney's fees for delay in payment;

D. A trial by jury on all issues so triable; and

E. Such other and further relief that this Court may deem just, proper, and appropriate.

**WHEREFORE**, Plaintiff NOEL O. CARTER prays that this Honorable Court grant the following relief on his state tort claims:

A. Judgment for compensatory damages against Defendants;

B. Judgment for attorney's fees together with the costs and expenses of this action;

C. Judgment for pre-judgment interest on all economic losses, including judgment for damage due to the lack of insurability of Plaintiff; and pre-judgment interest on attorney's fees for delay in payment;

D. A trial by jury on all issues so triable; and

E. Such other and further relief that this Court may deem just, proper, and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, NOEL O. CARTER, by and through undersigned counsel, hereby demands a jury trial in the above-referenced matter.

Respectfully submitted this 3rd of June 2019.

Respectfully Submitted,

**THE LAW OFFICE OF NATALIE JACKSON**

Natalie Jackson, Esq.
Attorney for Plaintiff NOEL O. CARTER
Florida Bar Number: 0646075
The Law Office of Natalie Jackson
905 Historic Goldsboro Blvd.
Sanford, FL  32771
Telephone: (407) 437-9295
Fax: (407) 386-8024
Primary E-Mail: natalie@nataliejacksonlaw.com
Secondary E-Mail: natalie@askattorneyjackson.com